AVENT, Appellee,

v.

AVENT, Appellant.

[Cite as *Avent v. Avent,* 166 Ohio App.3d 104, 2006-Ohio-1861.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–05–1140.

Decided April 14, 2006.

Martin E. Mohler and Heather J. Fournier, for appellee.

M. Susan Swanson, for appellant.

---

Skow, Judge.

{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Domestic Relations Division, which determined the marital-property division in a final divorce decree. Because we conclude that the trial court erred in its determinations, we reverse.

{¶ 2} Appellant, Elizabeth A. Avent, and appellee, Billy R. Avent Sr., were married in 1978 and executed a prenuptial agreement, which stated that the parties desired to keep each of their financial estates separate and that any property owned by them prior to or acquired after the marriage would remain their separate properties. Each waived any claims against the other arising "by force of the contemplated marriage."

{¶ 3} Billy filed for divorce in December 2003. At the time of trial in December 2004, he was 86 years old, his wife was 81, and both were retired. The trial court found that the parties were unable to remember many important facts about their earned income over the years or their present assets. The following summarizes the court's factual findings or other undisputed facts presented at trial.

{¶ 4} Billy retired in 1983, after 43 years of employment with the same company. He received $141,274 as a lump-sum retirement distribution from that employment, which was placed in "separate IRA [Individual Retirement Accounts] accounts." His yearly income included $14,628 from Social Security plus $9,118 from his IRA, for a total of $23,746.

{¶ 5} Elizabeth retired in 1986, after working for 11 years as a cafeteria worker. Her yearly income totaled $12,814, which included $461 per month from Social Security, $169 per month from School Employees Retirement System ("SERS") and $4,000 to $5,000 per year in withdrawals from "her present assets."

{¶ 6} Billy's grandson, a financial consultant, testified regarding the present value of assets in Billy's name, which the court valued at $129,078. He stated that he had been handling his grandfather's finances since 1997. Elizabeth's assets were valued as follows. During the pendency of the divorce action, Elizabeth's assets were placed in two trusts: the Avent Irrevocable Trust and the Elizabeth A. Avent Living Trust. The Avent Irrevocable Trust consisted of Elizabeth's home and 278 bonds. Elizabeth's accountant said that the bonds had a cost basis of $99,175, with a future value of $245,852. The court stated that interest income on the bonds until maturity was projected to be $155,677. The

court also valued Elizabeth's marital portion of appreciation on her house at $30,000.

{¶ 7} The court valued Elizabeth's living trust ("revocable trust") at $188,049, which included cash gifts made to her daughter and various bank accounts that were all solely in Elizabeth's name. The court declared that the appreciation on the wife's house was marital, awarding her the $30,000 appreciation of that property and an additional $60,000 "in consideration of her share of husband's separate pension, the fact that there will be no spousal support, and assets she claims and accountant deemed to be inherited."

{¶ 8} The court determined that all of Elizabeth's bank accounts, bonds, or other cash assets held in her own name were marital because she had failed to adequately trace her "separate property" owned prior to the marriage to her present assets. The court stated that Billy had traced his property sufficiently, awarding him the $129,078 of assets in his name. In addition, the court ordered Elizabeth to transfer to Billy one-half of her bonds placed in the irrevocable trust and to pay Billy an additional $64,045, one-half of the remaining assets in Elizabeth's name ($188,089 minus $60,000 equals $128,089 divided by two).

{¶ 9} Neither spouse was awarded spousal support, both spouses were ordered to pay their own attorney fees, and court costs were to be split equally between the parties.

{¶ 10} Elizabeth now appeals from that decision, arguing the following three assignments of error:

{¶ 11} "I. The Trial Court erred to the prejudice of the Appellant by requiring the tracing of separate assets that had not been found to have been commingled.

{¶ 12} "II. The Court abused its discretion in finding that Appellant had failed to prove her financial accounts to be separate property by a preponderance of the evidence.

{¶ 13} "III. The Court abused its discretion and committed prejudicial error in making a distributive award from Appellant's separate property without considering all of the factors set forth in R.C. 3105.171(F)(1) through (9)."

I

{¶ 14} In her first assignment of error, Elizabeth argues that the trial court erred in requiring her to trace assets that were never commingled with her husband's funds and that the appreciation of her home should have been deemed separate property. We agree.

{¶ 15} In a divorce action, the domestic relations court is required to determine whether property is separate or marital and to divide both marital and

separate property equitably. R.C. 3105.171(B). Marital property generally includes all property acquired by either party during the marriage as well as the appreciation of separate property due to the labor, monetary, or in-kind contributions of either party during the marriage. R.C. 3105.171(A)(3)(a)(i) and (iii). Marital property is to be divided equally in general, and each spouse is considered to have contributed equally to the acquisition of marital property. R.C. 3105.171(C)(1) and (2). However, marital property does not include separate property. R.C. 3105.171(A)(3)(b). Under R.C. 3105.171(A)(6)(a)(v), separate property includes any real or personal property that is excluded by a valid antenuptial agreement. Thus, Ohio law specifically allows for property that would normally be considered marital to be excluded from a division of marital property by a valid antenuptial agreement. *Todd v. Todd* (May 4, 2000), 10th Dist., No. 99AP–659, 2000 WL 552311.

{¶ 16} An antenuptial agreement is a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or husband are determined and set forth in a written instrument. *Gross v. Gross* (1984), 11 Ohio St.3d 99, 102, 11 OBR 400, 464 N.E.2d 500. The law of contracts applies to the interpretation and application of antenuptial agreements. *Fletcher v. Fletcher* (1994), 68 Ohio St.3d 464, 467, 628 N.E.2d 1343. The interpretation of a contract that is clear and unambiguous is a question of law, and no issue of fact exists to be determined. *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377; *Davis v. Loopco Industries, Inc.* (1993), 66 Ohio St.3d 64, 66, 609 N.E.2d 144. On appeal, questions of law are reviewed de novo. *Wiltberger v. Davis* (1996), 110 Ohio App.3d 46, 51–52, 673 N.E.2d 628.

{¶ 17} In Ohio, antenuptial agreements are valid and enforceable "(1) if they have been entered into freely without fraud, duress, coercion, or over-reaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." *Gross,* 11 Ohio St.3d 99, 11 OBR 400, 464 N.E.2d 500, paragraph two of the syllabus. See, also, *Fletcher,* 68 Ohio St.3d at 466, 628 N.E.2d 1343. If parties have freely entered into a prenuptial agreement, a court should not substitute its judgment and amend the contract. *Gross,* 11 Ohio St.3d at 109, 11 OBR 400, 464 N.E.2d 500.

{¶ 18} In the present case, the parties entered into a prenuptial agreement that clearly expressed, "[I]t is mutually desired and agreed by the parties that the estate of each of the parties shall remain separate, as well after as previous to the solemnization" of their marriage. The agreement states further that the husband's estate "shall remain and be his separate property, subject entirely to

his individual control and use, *the same as if he were unmarried;* and that the second party [wife] shall not acquire *by force of the contemplated marriage* for herself, her heirs, assigns or creditors any interests *in his property* or estate, or right to the control thereof, and the second party shall and *does hereby waive, release, and relinquish,* and shall by these presents be barred from any and all claim or rights of dower, year's support, right to live in the mansion house, property exempt from administration, distributive share or intestate share of the other's estate, from any and all claims or rights as widow, heir, distributee, survivor, or next of kin, and *any and all other claims, to the property of the first party now owned or hereafter acquired."* (Emphasis added.)

{¶ 19} In the following paragraph, the agreement sets forth the same language with reference to Elizabeth's estate and control, with Billy waiving all rights to any property owned or acquired by Elizabeth. In other words, the agreement indicates the parties' intent to keep separate not only the property owned at the time of the marriage, but also any increase in value or additional property each might separately acquire during the marriage.

{¶ 20} In this case, the record shows that the parties never commingled their funds in joint bank accounts and never owned real estate together. All bank accounts and stocks were maintained in each party's separate name prior to and after the marriage. Billy's retirement distribution was placed in his own separate account. Likewise, any funds or inheritance monies received by Elizabeth were placed in her own accounts. Since the antenuptial agreement specifically provided that each party waived any rights to each other's property acquired prior to or after the marriage, any funds or assets separately owned by the parties, which had never been commingled, remained their separate properties. No evidence was presented that any of Elizabeth's funds were ever commingled with or taken from Billy's funds. Therefore, Elizabeth's accounts, which had always been separately maintained, remained her own separate property, and no tracing was required.

{¶ 21} In addition, although Billy testified that he had paid for certain expenses related to Elizabeth's home over the years, the antenuptial agreement specifically states that he agreed to waive any claim to property acquired after or arising "by force of" the marriage, i.e., a claim for a contribution to the appreciation of the home where the parties resided. Moreover, there was nothing in the record to indicate the exact amounts of his alleged payments or other contributions, or that they significantly affected the appreciation of the property value beyond what would have naturally occurred. We also note that at the time of the marriage, Billy owned two homes that he no longer owned at the time of the divorce. Presumably, by virtue of his living in Elizabeth's home, he was able to sell or otherwise dispose of those properties to his advantage, with no accounting or

credit to wife. Consequently, under the terms of the antenuptial agreement, any appreciation on Elizabeth's home was separate property. Therefore, under the facts of this case, we conclude that the trial court erred in failing to designate the assets owned by each party as their separate property, not subject to division as marital property.

{¶ 22} Accordingly, appellant's first assignment of error is well taken. In light of our disposition of the first assignment of error, appellant's second assignment of error is moot.

## II

{¶ 23} In her third assignment of error, Elizabeth asserts that the trial court failed to properly consider the factors set forth in R.C. 3105.171(F), and erred in distributing her separate property to appellee. Again, we agree.

{¶ 24} As we previously determined, the court erroneously ruled that Elizabeth's accounts were marital because she had not adequately traced the funds. In making the property division, the court then erroneously divided and awarded a portion of Elizabeth's assets to Billy. The court stated that Elizabeth had acted "contrary to Court Order" by "diverting" funds to the two trust accounts and to her daughter and by her failure to amend and update the initial asset list filed with her answer. Nothing in the record, however, demonstrates that Elizabeth, who relied on her daughter and financial consultants to advise her, attempted to hide or dissipate assets by placing them in trust. In addition, Elizabeth executed the trusts when no divorce proceedings were pending, on the advice of an attorney and financial consultant, and considering her age.[1]

{¶ 25} Furthermore, although noting that the frequent moving of Elizabeth's funds made it "very difficult to exactly trace the past and present assets," the court never made an actual finding of misconduct or dissipation of marital assets. In fact, the court recognized that both parties were elderly and had trouble remembering many financial details spanning their 25–year marriage. Thus, since appellant's assets were, in fact, her separate property and within her sole control, her decision to give away money or to place some of her money and property in trust was not improper.

{¶ 26} The trial court further stated that it had considered the factors in R.C. 3105.171(F) and had awarded an inequitable distribution of "marital assets held by wife" solely because she could not trace her assets. Nothing in the final judgment indicates that the court awarded these assets on the basis of any other

---

1. Elizabeth testified that the trusts were set up prior to Billy's filing of the divorce complaint on December 9, 2003.

factor in R.C. 3105.171(F). Again, since we determined that the tracing of assets held solely in appellant's name was not required and there was no misconduct by appellant regarding her assets, the trial court erred in distributing a portion of Elizabeth's assets to husband.

{¶ 27} Accordingly, appellant's third assignment of error is well taken.

{¶ 28} Pursuant to App.R. 12(B), this court hereby renders the judgment that should have been rendered by the trial court and therefore modifies paragraphs two through seven of page seven of the trial court's divorce decree judgment entry as follows:

{¶ 29} "WHEREFORE, IT IS ORDERED:

{¶ 30} " * * *

{¶ 31} "2. For the purpose of making a division of marital property, the period of time "during the marriage" was from the date of the marriage through the day of the trial. The parties are bound by the terms of a valid antenuptial agreement which provided that each waived any claim or rights to the other's property owned prior to or acquired after the marriage. After considering that the parties at all times conducted their financial affairs separately and that no evidence of commingling of funds was presented, we conclude that, under the language of the antenuptial agreement, there is no marital property to divide.

{¶ 32} "3. Wife shall keep, as her separate property, the real estate at 2332 Dana Street and any appreciation in its value. Wife shall further keep all assets, including bank accounts and stocks which are solely owned by her or in her name. Wife shall also keep her personal property to which the parties stipulated.

{¶ 33} "4. Husband shall keep, as his separate property, all funds and accounts relating to his retirement distribution, and any other assets, including bank accounts, stocks, or other funds, which are solely owned by him or in his name. Husband shall also keep his personal property to which the parties stipulated.

{¶ 34} "5. Pursuant to the parties' agreement, neither shall pay spousal support to the other and the Court does not retain jurisdiction over the issue of spousal support.

{¶ 35} "6. Each party shall pay his/her outstanding debts, attorney fees and costs. After application of the initial filing fee(s), the parties shall equally pay the remaining court costs.

{¶ 36} "IT IS SO ORDERED."

{¶ 37} The judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is reversed and modified as designated in this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.

Judgment reversed.

HANDWORK and PIETRYKOWSKI, JJ., concur.